

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ENGINEERING DYNAMICS, INC.                    CIVIL ACTION

VERSUS                                        NUMBER: 89-1655

STRUCTURAL SOFTWARE, INC., ET AL.             SECTION: "S"(5)


### ORDER AND REASONS

The above matter is before the Court following remand by the
Fifth Circuit.  _Engineering Dynamics, Inc. v. Structural Software,
Inc._, 26 F.3d 1335 (5th Cir. 1994), _opinion supplemented on denial
of reh'g by_ 46 F.3d 408 (5th Cir. 1995).  Before commencing to
discuss the present issues, the undersigned feels it appropriate to
review the instructions from the Circuit Court as to the remaining
matters in this litigation.

This Court restricted the parties initially to a Phase One
trial on whether input/output formats and user interfaces of



plaintiff's SACS III, SACS IV, SEASTATE and JOINTCAN modules to its computer programs were subject to a copyright and, if so, what the scope of the copyright would be.  In its opinion, the Fifth Circuit first addressed the issue of copyrightability of input/output formats and user interfaces on remand.

Defendant had originally argued on appeal that 1) user input formats were not copyrightable as a matter of law; 2) EDI's computer input and output formats represented unoriginal facts and lists of facts that were not subject to being copyrightable and thus could not be infringed; and 3) the SACS IV input and output formats represent an uncopyrightable idea, process or method.  EDI, on the other hand, argued in response that its input and output formats, taken as a whole, were copyrightable and that defendant had engaged in "massive appropriation of plaintiff's expression at the interface".

The Fifth Circuit initially noted that "copyright protection extends not only to the literal elements of a program, i.e., its source code and object code, but also to its 'nonliteral' elements, such as the program architecture, 'structure, sequence and organization', operational modules and computer-user interface." Id. at 1341.  However, the Court went on to note that as one moves away from the literal code, "it becomes more difficult to

2

distinguish between unprotectable ideas, processes, methods or functions, on one hand, and copyrightable expression on the other. Id. at 1341. The Court then clarified that defendant's position that input formats were not copyrightable as a matter of law was erroneous. Kepner-Tregoe, Inc. v. Leadership Software Inc., 12 F.3d 527 (5th Cir.), cert. denied, 513 U.S. 820, 115 S.Ct. 82 (1994).

The input and output formats for SACS IV are quasi-textural. They guide the user in performing a series of sophisticated structural analyses but consist of a series of words and a framework of instructions that act as prompts for the insertion of relevant data. EDI has defined its copyrighted work to be the structure, sequence and organization of the work as a whole which it defines as somehow unique.

In reaching a conclusion on this issue, the Fifth Circuit endorsed the abstraction-filtration-comparison method of determining copyright protection for computer programs set forth in Gates Rubber Co. v. Bando Chemical Indus., 9 F.3d 823 (10th Cir. 1993). The Court summarized this method as follows:

> First, in order to provide a framework for analysis, we conclude that a court should dissect the program according to its varying levels of generality as provided in the abstractions test. Second, poised with this framework, the court should examine each level of abstraction in order to filter out those

3

> elements of the program which are
> unprotectable. Filtration should eliminate
> from comparison the unprotectable elements of
> ideas, processes, facts, public domain
> information, merger material, scenes a faire
> material, and other unprotectable elements
> suggested by the particular facts of the
> program under examination. Third, the court
> should then compare the remaining protectable
> elements with the allegedly infringing program
> to determine whether the defendants have
> misappropriated substantial elements of the
> plaintiff's program. Id. at 834

The Court then went on to narrow and refine the portions of this
test which this Court must still consider.

The purpose of the abstraction portion of the test is to
differentiate the abstraction of ideas from the manner in which
those ideas are expressed. On this element the Fifth Circuit noted
that plaintiff sought protection, not for its entire suite of
programs, but for only 230 input/output formats[1] that comprised the
user interface. Further, plaintiff sought protection en masse and
not for individual formats. This being the case, the Circuit Court
found that the formats, when taken as a whole, qualify as
expression rather than a mere idea. The purpose of these formats
is to mediate between the user and the program, identifying what
information is essential and how it must be ordered to make the

---

[1] However, on remand the number of formats for which
protection was sought was further reduced as seen hereinafter.

4

program work. Similarly, the output formats structure the results informatively. Because of the scientific and technical nature of this particular program, these interfaces were found to be more than mere blank forms which by any standard would be unprotected. Further, the Court found that there was more than one way that the formats could have been constructed to achieve their purpose and for that reason the Court moved past the abstraction portion of the test.

In discussing filtration, the Fifth Circuit noted that this component of the analysis seeks "to isolate noncopyrightable elements from each particular level of a program" since copyright "does not protect processes, methods or scientific discoveries". Nor does it protect "facts, information in the public domain, and scenes a faire, i.e., expressions that are standard, stock or common to a particular subject matter or are dictated by external factors". Id. at 1344.

SSI had argued several issues on appeal that dealt with the filtration issues. The first of which was that plaintiff's user interfaces comprised unoriginal facts which could not be copyrighted. The Court determined that, as a matter of law, the input formats and output reports in question did not embody only noncopyrightable facts. Rather, the formats at issue were organized

5

descriptive tables for entry of data on which the computer would perform calculations rather than a representation of facts per se.

Defendant argued secondly that the data formats were a template, process or method by which an engineer used the computer. The Court queried whether the utilitarian function of the input formats, which activated the mechanical portion of the program, outweighed their expressive purpose so as to preclude protection. The Court answered that question in the negative, finding that the formats indicated the data that the user must collect and how it must be organized for the program to function.  The Court further noted that EDI "has proven original expressive content in the selection, sequence and coordination of inputs".  Id. at 1346.

Defendant's third argument was that the interfaces were mere compilations of fact not protected by law.  The Court appears to have rejected this argument as well in that the Court noted that EDI's data cards consist of more than mere facts.  Rather, the cards were held to be a progressive demonstration of a particular engineering program.  Further, the Court felt that EDI had selected data and arranged their placement on the cards in a way that was unique and original to SACS, noting the existence of other programs in the market which handled things differently.

Lastly, defendant argued that the formats in question were

6

dictated by industry standards in the engineering field and/or practice in the offshore engineering market. Specifically, SSI argued that in order to provide a compatible, standardized and efficient product for its customers, it had to use the formats in question and for this reason they were unprotected. This issue the Court found open upon remand for further development.

On this last point, the Court was instructed to determine, using filtration, whether the similarities in some of the formats are due to the inherent qualities of the ideas expressed in the field of engineering, i.e., merger, or compliance with industry standard, i.e., scenes a faire. The Court further questioned whether there are multiple ways to express the relevant concepts consistent with industry practice.

After tackling these issues, the Court required "a close examination of actual input formats to determine whether the allegedly infringed cards are copyrightable". Id. at 1347. This instruction addresses the background under which EDI came into the market in the first place. Some years ago a company named Synercom brought a computer program named STRAN to the market to solve engineering problems in the field of structural analysis. After the STRAN product had been on the market for some five years, EDI entered the arena with its own program called SACS II designed for

7

the same purpose as STRAN and which used the exact same input
formats as the Synercom product.   This resulted in litigation
wherein Synercom claimed infringement of its registered copyrights.
Synercom Technology, Inc. v. University Computing Co., 462 F. Supp.
1003 (N.D. Tex. 1978).

The Synercom case resulted in a holding that neither the input
formulas for the STRAN program nor their sequence or organization
were copyrightable.   EDI now believes itself to be in the same
position Synercom was in when litigation ensued between those
parties, perhaps giving credence to the old maxim that "what goes
around comes around".  Therefore, the Fifth Circuit has noted that,
if the cards for which EDI claims copyright protection almost
wholly derive from the input formats developed by Synercom many
years earlier, they would also lack the requisite originality to be
copyrightable.

After the Court completes the filtration portion of the test,
a determination must be made as to whether there is substantial
similarity between the two works.  At this point, the Court is
instructed to "focus on whether the defendant copied any aspect of
protected expression".  Computer Assocs. Int'l, Inc. v. Altai,
Inc., 982 F.2d 693 (2d Cir. 1992).  And further, the Court's
ultimate focus should be directed to the input and output reports

taken as a whole.  At this point the Fifth Circuit noted, rather pointedly, that the law is more protective of highly creative works than it is of functional works which contain highly standardized technical information.  Indeed, "if technical or conceptual constrains limit the available ways to express an idea...copyright law will abhor only a virtually identical copy of the original." Apple Computer Inc. v. Microsoft Corp., 799 F. Supp. 1006, 1021 (N.D. Cal. 1992), aff'd 35 F.3d 1435 (9th Cir. 1994), cert. denied, 513 U.S. 1184, 115 S.Ct. 1176 (1995).

Against the above backdrop, the Court will review the evidence presented by the parties on these issues, noting significantly, however, the Fifth Circuit's directive to determine "whether the **thin copyright** EDI may enjoy has been infringed." (Emphasis Added) Because the Court believes the order and sequence for both input and output formats was in the public domain without protection before defendant copied any portion of same, only that issue will be addressed.  Other issues in the Fifth Circuit's opinion will be pretermitted.

The SACS suite of computer programs is utilized mainly by engineers and contains approximately 23 modules.  Each module performs certain kinds of structural analysis in the process of engineering design. The SACS IV module and its predecessor, SACS

9

III, handle fundamental strength calculations.  The SEASTATE module handles calculations involving the effects of current and waves upon given structures and is important in the design of offshore structures.   The JOINTCAN module deals with calculations for special kinds of joints between tubular members of a structure. Each of these modules can work in a stand alone fashion or can work interactively with one another or with other modules in the SACS suite.

Initially, the Court required post trial that EDI identify with specificity the input and output formats over which it claimed protection.  Surprisingly, up until that point in time, EDI had been non-specific as to the formats which it considered unique to itself.  The Court further required that exhibits be identified upon which plaintiff relied for its position that the formats were protected.  Those have now been identified as follows:

### LIST OF PROTECTED INPUT FORMATS
### OF SACS III & IV

| TAB | INPUT FORMAT | STAGE ONE EXHIBIT REF. |
|---|---|---|
| 1. | Load Case Selection Cards (LDCASE) | Ex. 10, at pp.3-4-3A - 3-4-3B |
| 2. | Output Load Condition Options Card (OPTIONS output) | Ex. 10, at pp. 3-4-4, 3-4-5 |

3.   Redesign Option Card (REDESIGN)        Ex. 10, at pp. 3-4-6 -
                                            3-4-7

4.   Minor Axis Redesign Limit Card         Ex. 10, at pp. 3-4-7A -
     (REDESIGN limit)                       3-4-7B

5.   Hydrostatic Collapse Option Card       Ex. 10, at pp. 3-4-8 -
     (HYDRO)                                3-4-9

6.   Unity Check Partition Card             Ex. 10, at pp. 3-4-10 -
                                            3-4-11

7.   Member Offsets Card (MEMBER OFFSETS)   Ex. 10, at pp. 3-4-24 -
                                            3-4-25

8.   Plate Stiffener Description            Ex. 10, at pp. 3-4-26 -
     Card (PSTIF)                           3-4-27

9.   Plate Group Description Card           Ex. 10, at pp. 3-24-28
     (PGRUP)                                - 3-24-29

10.  Plate Description Card (PLATE)         Ex. 10, at pp. 3-4-30 -
                                            3-4-31

11.  Plate Offsets Cards One and Two        Ex. 10, at pp. 3-4-32 -
     (PLATE OFFSETS)                        3-4-33

12.  Plate Temperature Load Card            Ex. 10, at pp. 3-4-34 -
     (PLATE TEMP)                           3-34-35

13.  Member Temperature Load Card           Ex. 10, at pp. 3-4-50 -
     Set (LOAD TEMP)                        3-4-51

## LIST OF PROTECTED INPUT FORMATS
## OF SEASTATE

14.  Seastate Load Options Card             Ex. 13, at pp. 2-4-2 -
                                            2-
     (LDOPT)                                4-3

15.  File Directive Card (FILE)             Ex. 13, at pp. 2-4-6 -
                                            2-4-7

11

16.  Wind Area Cards (AREA wind)          Ex. 13, at pp. 2-4-8 - 2-4-9

17.  Submerged Area and Volume Cards      Ex. 13, at pp. 2-4-10 - 2-4-11
     (AREA submerged)

18.  Drag and Inertia Coefficient         Ex. 13, at pp. 2-4-12 - 2-4-13
     Cards (CDM)

19.  Reynolds Number Dependent            Ex. 13, at pp. 2-4-14 - 2-4-15
     Drag Cards (REYFAC coeffs.)

20.  Reynolds Number Dependant Drag       Ex. 13, at pp. 2-4-16 - 2-4-17
     Data Cards (REYFAC options)

21.  Hydrodynamic Group Over-Ride         Ex. 13, at pp. 2-4-18 - 2-4-19
     Cards (GRPOV)

22.  Hydrodynamic Member Over-Ride        Ex. 13, at pp. 2-4-20 - 2-4-21
     Cards (MEMOV)

23.  Marine Growth Override Cards         Ex. 13, at pp. 2-4-22 - 2-4-23
     (MGROV)

24.  Wind Definition Cards (WIND)         Ex. 13, at pp. 2-4-26 - 2-4-27

25.  Submerged Area Loan Definition       Ex. 13, at pp. 2-4-28 - 2-4-29
     Cards (DRAG)

26.  Mudflow Definition Parameters        Ex. 13, at pp. 2-4-30 - 2-4-31
     Cards (MFLO parameters)

27.  Mudflow Load Profile Definition      Ex. 13, at pp. 2-4-32 - 2-4-33
     Cards (MFLO profile)

28.  Wave Load Generation Cards           Ex. 13, at pp. 2-4-34 - 2-4-35
     (WAVE)

29.  Current Cards (CURRENT)              Ex. 13, at pp. 2-4-36 - 2-4-37

30.  Dead Load and Buoyancy               Ex. 13, at pp. 2-4-38 -

Cards (DEAD)                                    2-4-39

31.   User Defined Wave, Grid Station          Ex. 13, at pp. 2-A-4 -
      Cards (WAVE XLOC)                         2-4-5

32.   User Defined Wav, Grid Level             Ex. 13, at pp. 2-A-6 -
      Cards (WAVE YLOC)                         2-A-7

33.   User Defined Wave, Wave Surface          Ex. 13, at pp. 2-A-8 -
      Cards (WAVE SURF)                         2-4-9

34.   User Defined Wave, Surface               Ex. 13, at pp. 2-A-10 -
      Horizontal Velocity Cards                2-A-11
      (WAVE SURD surf. horiz. veloC.)

35.   User Defined Wave, Surface Drag          Ex. 13, at pp. 2-A-12-
      Pressure Cards (WAVE SURD surf.          2-A-13
      horiz. drag press)

36.   User Defined Wave, Surface                Ex. 13, at pp. 2-A-14-
      Horizontal Accleration Cards             2-A-15
      (WAVE SURD surf. horiz. accel.)

37.   User Defined Wave, Surface                Ex. 13, at pp. 2-A-16-
      Horizontal Inertia Pressure Cards        2-A-17
      (WAVE SURD surf. horiz. inertia press.)

38.   User Defined Wave, Surface               Ex. 13, at pp. 2-A-18-
      Vertical Velocity Cards                  2-A-19
      (WAVE SURD surf. vert. velocity)

39.   User Defined Wave, Surface               Ex. 13, at pp. 2-A-20 -

      Vertical Drag Pressure Cards             2-A-21
      (WAVE SURD surf. vert. drag press.)

40.   User Defined Wave, Surface               Ex. 13, at pp. 2-A-22-
      Vertical Acceleration Cards              2-A-23
      (WAVE SURD surf. vert. accel.)

41.   User Defined Wave, Surface               Ex. 13, at pp. 2-A-24-
      Vertical Inertia Pressure Cards          2-A-25
      (WAVE SURD surf. vert. inertia press.)

42.  User Defined Wave, Horizontal        Ex. 13, at pp. 2-A-26-
     Velocity Cards (WAVE SURD            2-A-27
     horiz. velocity)

43.  User Defined Wave, Horizontal        Ex. 13, at pp. 2-A-28-
     Drag Pressure Cards                  2-A-29
     (WAVE SURD horiz. drag press.)

44.  User Defined Wave, Horizontal        Ex. 13, at pp. 2-A-30-
     Acceleration Cards                   2-A-31
     (WAVE SURD surf. horiz. accel.)

45.  User Defined Wave, Horizontal        Ex. 13, at pp. 2-A-32 -

     Inertia Pressure Cards               2-A-33
     (WAVE SURD surf. horiz. interia press)

46.  User Defined Wave, Vertical Velocity Ex. 13, at pp. 2-A-34-
     Cards (WAVE SURD. vert. velocity)    2-A-35

47.  User Defined Wave, Vertical          Ex. 13, at pp. 2-A-36-
     Drag Pressure Cards                  2-A-37
     (WAVE SURD vert. drag press.)

48.  User Defined Wave, Vertical          Ex. 13, at pp. 2-A-38-
     Accleration Cards                    2-A-39
     (WAVE SURD vert. accel.)

49.  User Defined Wave, Vertical          Ex. 13, at pp. 2-A-40-
     Inertia Pressure Cards               2-A-41
     (WAVE SURD inertia press.)

### LIST OF PROTECTED INPUT FORMATS
### OF JOINTCAN

50.  Punching Shear Options Card (PS)     Ex. 15, at p. 19-4-2

51.  Yield Stress Modification Card       Ex. 15, at p. 19-4-4
     (UMOD)

52.  Punching Shear Group Modification    Ex. 15, at p. 19-4-6
     (GMOD)

53.   Punching Shear Joint Modification      Ex. 15, at p. 19-4-8
      (JMOD)

54.   Punching Shear Weld Allowable Card     Ex. 15, at p. 19-4-10
      (WELD)


There is no meaningful testimony from either the principal of

EDI, Dr. Garland, or his experts as to why these formats either

individually or as a whole should be protected.  Indeed, when asked

by opposing counsel why he found any portion of his program unique,

Dr. Garland replied in the following fashion:

BY MR. SOMMER:

Q.  I want to know what is creative about the order of the
input cards for SACS III?

A.  It came out of my brain.

Q.  What is originally creative about it?

A.  I did it.

Q.  Other than the fact you did it and it's in arbitrary
order?

A.  It's not arbitrary.

Q.  Why isn't it arbitrary?

A.  It's the way I see the world from an engineering viewpoint
based on my training over a period of many, many years,
understanding the science of structural mechanics, becoming
involved in the order of doing structural analysis and coming
up with a consistent methodology I could pass on to the users
of my program system.

Q.  Is there anything else about the order that is creative

15

and original other than what you just described?

A.    Yes.    Well, other than the fact that I created it or my company created this program system, the other creative elements that are in there are the way in which we develop relationships between the various data inputs that are required or the data collection process required by an engineer.  Because we instruct him in a very unique way to go out, assemble a subset of the universe of data that is out there, that would be required to perform a structural analysis according to the way EDI does it.

Q.  Well, what specifically is creative and original about the order of the input cards?

MR. POTTER: I object.   That has been asked and answered several times.   It's argumentative.

MR. SOMMER: There is nothing more, there is nothing more.   I'm happy with you telling me that?

THE WITNESS: I don't know what you are looking for.
                                    (Trans. pp. 132-133).

Defendant has pointed out that there is no copyright which has been issued by the Copyright Office covering these specific formats over which EDI seeks protection either individually or as a whole. See Defendant's Exhibit 76.  The Court further notes, however, that there is verbal testimony from Dr. Garland relating certain specific cards to either the original STRAN program, to SACS II or the uncopyrighted SEASTATE, which defendant has embodied in its exhibits 67, 68 and 69, admitted into evidence without objection. The following colloquy with Dr. Garland is relevant:

BY MR. DRY:

Q.   I don't have much more, your Honor.   I would like to approach the witness and hand him a blown up copy of Defendant's Exhibit 67, 68 and 69.   Those reduced versions are in your book.   ...

Q.  Have you had a chance to review those, Dr. Garland?

A.  I have seen these before.   I haven't reviewed them recently.

Q.  I believe 67 relates to input formats and it's a variation of our Exhibit Number 6.   And what that shows is there is another column to the right labeled SACS II.   Do you see that?

A.  Yes, I do.

Q.  Would you tell the Court what SACS II was?

A.   SACS II was the first version of SACS IV, that was marketed beginning in about 1974.

Q.   Now, isn't it true that that was distributed with that without copyright or any other notice of copyright claim?

A.  The Court seems to think that it was, but I don't. ...

BY MR. DRY:

Q. The point I want to make with Exhibits 67, 68 and 69, if you would, Dr. Garland, you see under SACS II there are lines drawn to certain things under SACS III?

A.  That's correct.

Q.  And my question is, where those lines appear, would you agree that those were taken from SACS II and then embodied in SACS III?

A.  That's correct.

Q.   Item for item, as you see there in 67 and then under SEASTATE in 68 the same sort of thing, except it's now called SEASTATE I.  I assume SEASTATE I was the original version of,

17

too [sic]?

A.   When you say embodied, that means that they weren't
transferred over as a duplicate copy, but they were probably
enhanced inside of the SACS III Manual when we transferred
them from the SACS II Manual.

Q.   Same basic concept added a few cards to perform a few
extra functions?

A.   There is, depending on which way you look at it, a
substantial amount of changes to the original formats.

Q.   Here is the point, in the deck, SACS III came out, you
were still using the IBM cards and still had data decks rather
than a selection of data points or not?

A.   Were there still data cards in use at this point in time?

Q.   Yes, sir.

A.   Yeah, there were people still using data cards at this
point in time. ... Data cards SACS III, about 1979 there were
still people using key punch cards.  At this point in time the
industry was moving away from that fairly rapidly, still
people using punch cards.

MR. DRY:  Would it be fair to say that EDI retained the same
on order and sequence for each of these subpart on SACS III
that you had created under SACS II?

A.   That would be a fair statement.

Q.   Would the same thing hold true for the input formats of
SEASTATE in Exhibit 68?

A.   Again that would be a fair statement.  We haven't changed
the order and sequence since its inception.

Q.   How about in the SACS III output reports in Exhibit 69?

A.   That one I am not as sure about, may be some reworking of
the way the output reports went from year to year.   That

18

wasn't as stringent a requirement as the input was concerned. They are probably some reordering of the way in which they might have been presented to the clients and probably some of the reports may have been altered significantly.  Again, that is something that is not as stringent a requirement from a programming viewpoint as the input.

(Trans. pp. 114-118)
(emphasis added).

Referencing defendant's Exhibit 67, SSI has responded to plaintiff's argument of copyrightability, matching up input formats for each current program with the uncopywritten SACS II program as follows:

LIST OF INPUT FORMATS IN SACS III ORIGINATING
WITH THE SACS II PROGRAM

| TAB NO. | SACS II ORIGINATED | REMAINING CARDS |
|---------|--------------------|-----------------|
| 1 | | LDCASE |
| 2 | | OPTIONS output |
| 3 | | REDESIGN |
| 5 | | HYDRO |
| 6 | | UCPART |
| 7 | MEMBER OFFSETS | |
| 8 | PSTIF | |
| 9 | PGRUP | |
| 10 | PLATE | |
| 11 | PLATE OFFSETS | |
| 12 | PLATE TEMP | |
| 13 | LOAD TEMP | |

LIST OF INPUT FORMATS IN SACS IV ORIGINATING
WITH SACS II PROGRAM

| TAB NO. | SACS II ORIGINATED | REMAINING CARDS |
|---------|--------------------|-----------------|
| 1 | | LDCASE |
| 2 | | OPTIONS output |

19

```
3                                               REDESIGN


4                                               REDESIGN limit
5                                               HYDRO
6                                               UPCART
7                       MEMBER OFFSETS
8                       PSTIF
9                       PGRUP
10                      PLATE
11                      PLATE OFFSETS
12                      PLATE TEMP
13                      LOAD TEMP
```

         LIST OF INPUT FORMATS IN SEASTATE ORIGINATING
                 WITH SEASTATE I PROGRAM

| TAB NO. | SEASTATE I ORIGINATED | EDI TRIAL EXHIBIT NO. | EXHIBIT PAGE NO. | REMAINING CARDS |
|---------|-----------------------|------------------------|------------------|-----------------|
| 14 | LDOPT | 11 | 16 | |
| 15 | FILE | 11 | 17 | |
| 16 | AREA wind | 11 | 18 | |
| 17 | AREA submerged | 11 | A-6 | |
| 18 | CDM | 11 | 19 | |
| 19 | REYFAC coeffs. | 11 | A-11 | |
| 20 | REYFAC options | 11 | A-11 | |
| 21 | GRPOV | 11 | 20 | |
| 22 | MEMOV | 11 | 21 | |
| 23 | MGROV | 11 | A-14 | |
| 24 | WIND | 11 | 22 | |
| 25 | DRAG | 11 | A-16 | |
| 26 | | | | MFLO parameters |
| 27 | | | | MFLO profile |
| 28 | WAVE | 11 | 23 | |
| 29 | CURRENT | 11 | 34 | |
| 30 | DEAD | 11 | 35 | |
| 31 | *WAVE XLOC[2] | 11 | 27 | |

---

[2]  SSI contends that all cards referenced with an asterisk
were in SEASTATE I and, therefore, in the public domain.  These

```
32      *WAVE YLOC          11          28
33      *WAVE SURF          11          29
34                                              WAVE SURD
                                        Surf horiz veloc
35                                          WAVE SURD surf
                                        horiz drag press
36                                          WAVE SURD
                                        Surf horiz accel
37                                          WAVE SURD surf
                                        horiz inertia press
38                                          WAVE SURD surf
                                        vert velocity
39                                          WAVE SURD surf
                                        vert drag press
40                                          WAVE SURD surf
                                        vert accel
41                                          WAVE SURD surf
                                        vert inertia press
42      *WAVE SURD          11          30
        horiz velocity
43      *WAVE SURD          11          30
        horiz drag press
44      *WAVE SURD          11          31
        horiz accel
45      *WAVE SURD          11          31
      horiz inertia press
46      *WAVE SURD          11          32
         vert velocity
47      *WAVE SURD          11          32
        vert drag press
48      *WAVE SURD          11          33
        vert accel
49      *WAVE SURD          11          33
        vert inertia press
```

LIST OF INPUT FORMATS IN JOINTCAN

TAB NO.          NOT PART OF MATERIAL FOR          REMAINING CARDS

are depicted in the SEASTATE I user manual, EDI Exhibit 11.
Further, SSI contends that it has never used these cards in its
StruCAD*3D prgram.  Plaintiff does not refute this assertion.

WHICH COPYRIGHT WAS SOUGHT

| | | |
|---|---|---|
| 50 | | PS |
| 51 | UMOD | |
| 52 | GMOD | |
| 53 | JMOD | |
| 54 | WELD[3] | |

The copyright which plaintiff seeks to enforce cannot stand on the basis that certain of the formats in question were contained in one or more of the user's manuals which might have been covered by a copyright. What plaintiff seeks to enforce is copyrightability on a sequence or compilation of input formats over which no copyright has issued. What is present in any copyrighted user's manual is not the sequence and compilation as exists when the user interfaces with the product on a computer screen. Rather, it is a written document with a sequence distinctly its own. The Court notes that copyright protection was denied on the sequence of input formats which plaintiff submitted to the Copyright Office. See Defendant's Exhibit 76.

On this issue, defendant further argues, regarding input formats, that only the 1987 version of the SACS IV user manual was

_____

[3] SSI contends, and EDI does not contest, that the UMOD, GMOD, JMOD AND WELD cards referenced in tabs 51 - 54 of plaintiff's Rec. Doc. 259 submission were not in existence when this litigation was filed and should, therefore, be disregarded for purposes of this inquiry.

issued a registration by the Copyright Office and that EDI has failed to put that document into evidence.  Rather, when required by the Court to match an exhibit with a particular input format card which the Court might reference to determine protection, the court was initially referenced to an unregistered 1988 version of the SACS IV user manual, i.e., Exhibit 10.  Accordingly, defendant argues that the burden of proof to establish copyrightability has not been met.  This argument covers cards 1 through 13 of those for which protection is sought in Rec. Doc. 259.

EDI has responded by alleging that defendant does not allege that there are substantial differences between the 1987 and 1988 SACS IV manual.  But then plaintiff does not contest that the manual placed into evidence at this hearing and upon which it initially relied had not been registered.  Instead, plaintiff merely notes that those cards listed at tabs A 1-3 and A 5-6 of Record Document 259 appear in both the SACS III and SACS IV manual and that the Court should rely upon the SACS III manual instead.

Thereafter, however, plaintiff filed an amended cross reference to other exhibits dealing with the issue of input formats and basically argued that the law of the case established protection on its part.  The Court notes that, in the opinion of the undersigned, there is no law of the case which establishes

protection as to any specific input format.  If there were, the Fifth Circuit would have identified those cards which were no longer at issue and did, in fact, do so as to certain cards which it felt were so generic in nature as to be incapable of being protected.  As to other cards, the matter was remanded for consideration by this Court under the filtration test enunciated above.  This Court would not have been asked to undertake such an exercise if there were an established law of the case which the Fifth Circuit had ratified.

Further, the Court has reviewed the testimony of Dr. Guntur regarding which formats of the various modules at issue derive from the unprotected STRAN system.  Of interest is the following colloquy which stands effectively unrefuted by the plaintiff:

Q. ... Look at Defendants Exhibit 28.

A.  Yes, sir.

Q.  Does that refresh your memory?

A.  Yes, sir.

Q.  Does that accurately reflect the number of STRAN originated cards in the SACS IV Manual?

A.  Yes, sir.

Q.  And what is that number?

A.  Input data-wise there were totally 2,796 cards in example problem of SACS IV.

24

Q.  2,796?

A.  Correct.  Out of which 2,724 cards were STRAN based, STRAN formats.

Q.  STRAN originated?

A.  Correct.

(Trans. pp. 225-226).

As to output reports, plaintiff has identified in Rec. Doc. 259 the list for which it believes itself to be entitled to receive copyright protection as follows:

LIST OF PROTECTED OUTPUT FORMATS
OF SACS III & IV

| TAB NO | OUTPUT FORMAT | STAGE ONE EXHIBIT REF. |
|--------|---------------|------------------------|
| 16 | Optimization Data | Ex. 213 at p.26 |
| 17 | Joint Data List | Ex. 213 at p. 27 |
| 18 | Member Data Report | Ex. 213 at pp. 28-29 |
| 24 | Spring Data List | Ex. 209 at p. 6 (rev) |
| 25 | Plate Data List | Ex. 209 at p. 18 |
| 27 | Plate Stress Detail Report | Ex. 210 at p.60(back) |

LIST OF PROTECTED OUTPUT FORMATS
OF SEASTATE

| 1 | Input Report Options | Ex. 213 at p. 1 |
|---|----------------------|-----------------|
| 2 | Drag & Inertia Coefficient | Ex. 213 at p. 3 |
| 3 | Seastate Initial Grup Options | Ex. 213 at p. 4 |
| 4 | Seastate Initial Grup Description | Ex. 210 at p.24(back) |
| 5 | Seastate Global Grup Override | Ex. 213 at p. 5 |
| 6 | Seastate Global Marine Growth Zone Description | Ex. 213 at p. 6 |
| 7 | Seastate Area Descriptions | Ex. 213 at p. 7 |
| 8 | Seastate Member Summary | Ex. 213 at p. 8 |

25

| | | |
|---|---|---|
| 9 | Wind Description - Drag/Area Description for LDCASE | Ex. 213 at p. 9 |
| 10 | Current Description for LDCASE | Ex. 213 at p. 10 |
| 11 | Dead Load Description for LDCASE | Ex. 213 at p. 11 |
| 12 | Wave Load Description for LDCASE | Ex. 213 at p. 12 |
| 13 | Horizontal & Vertical Velocity and Acceleration Reports | Ex. 213 at p. 13 |
| 14 | Summation of Forces and Moments About Mudline at Elevation | Ex. 213 at p. 14 |
| 15 | Sheer & Moment at Mudline versus Wave Position | Ex. 213 at p. 15 |

## LIST OF PROTECTED OUTPUT FORMATS
## OF JOINTCAN

| | | |
|---|---|---|
| 19 | JTCAN Program Options Report | Ex. 213 at p. 39 |
| 20 | JTCAN Detail Report | Ex. 213 at p. 40 |
| 21 | Member Strength Joint Analysis | Ex. 213 at unnumbered post-40 |
| 22 | JTCAN Summary Report | Ex. 213 at unnumbered post-40 |
| 23 | Load Path Report | Ex. 213 at unnumbered post-40 |

## LIST OF PROTECTED OUTPUT FORMATS
## OF UNSPECIFIED MODULES

| | | |
|---|---|---|
| 26 | Plate Stress Summary Report | Ex. 210 at p.60 |
| 28 | Hydrostatic Collapse Analysis | Ex. 210 at p.20(back) |

In response, defendant advised that it had reviewed plaintiff's copyrighted user manuals for SEASTATE, SACS III and JOINTCAN Design II, i.e., plaintiff's Ex. 9, 12 and 14, to determine if the output reports above were mentioned therein. Since plaintiff failed to introduce the SACS IV user manual into evidence at this hearing, that document was not reviewed by

defendant.   Following this exercise, defendant generated the following information regarding plaintiff's contentions.

| TAB NO. | EDI TRIAL EXHIBIT NO. | EXHIBIT PAGE NO. | COMMENTS |
|---------|-----------------------|------------------|----------|
| 1 | 12 | 2-6-33 | |
| 2 | 12 | 2-6-37 | Report has been modified from its original form in SEASTATE user manual |
| 3 | 12 | 2-6-38 | Duplicate of report at Tab 4 |
| 4 | 12 | 2-6-38 | Duplicate of report at Tab 3 |
| 5 | 12 | 2-6-39 | Report has been modified from its original form in SEASTATE user manual |
| 6 | 12 | 2-6-43 | Report has been modified from its original form in SEASTATE user manual |
| 7 | 12 | 2-6-44 | |
| 8 | | | Not in any registered user manual |
| 9 | 12 | 2-6-49 | Report has been modified from its original form in SEASTATE user manual |
| 10 | 12 | 2-6-51 | |
| 11 | 12 | 2-6-47 | |
| 12 | 12 | 2-6-52 | |
| 13 | 12 | 2-6-53 | |
| 14 | 12 | 2-6-61 | |
| 15 | 12 | 2-6-62 | |
| 16 | 9 | 3-7-33 | Report has been modified from its original form in SACS III user manual. Report contains one line of data |
| 17 | 9 | 3-7-34 | |
| 18 | 9 | 3-7-38thru44 | Report has been modified from its original form in SACS III user manual |
| 19 | 14 | Unknown page number | Report has been modified from its original form in JOINTCAN Design II manual |
| 20 | 14 | Unknown page | Report has been modified |

|    |   | number  | from its original form in JOINTCAN Design II manual |
|----|---|---------|------------------------------------------------------|
| 21 |   |         | Not in any registered user manual                    |
| 22 |   |         | Not in any registered user manual                    |
| 23 |   |         | Not in any registered user manual                    |
| 24 | 9 | 3-5-12  |                                                      |
| 25 | 9 | 3-5-10  |                                                      |
| 26 |   |         | Report generated by StruCAD*3D                       |
| 27 | 9 | 3-5-31  |                                                      |
| 28 |   |         | Report generated by StruCAD*3D                       |

Defendant further points out that two of the output reports over which protection is sought originated with defendant and were not created by EDI at all. See Ex. B, Tabs 26 and 28, Rec. Doc. 259. Defendant additionally argues that certain of the output reports over which protection is now sought, in fact, vary from the original form as depicted in the user manual. See. Rec. Doc. 260, p. 4, et seq. for chart. Indeed, a total of 13 output reports over which copyrightability is claimed, according to defendant, were not even in the protected user's manual, 9 of which relate to SEASTATE and 4 of which relate to SACS III. Defendant argues that those remaining are insignificant numbers of reports to support expressive content for copyrightability.

Furthermore, as with the input formats, defendant contends that output formats in the programs at issue are likewise STRAN

28

based, in the public domain, and incapable of protection as sought

by plaintiff, per the following testimony from Michael Freeman:

> BY MR. DRY:
>
> Q.   When we were talking on direct, I admit we pretty well
> focused our attention on inputs.  But let me ask you this, on
> output.  However they look at some particular form of report,
> do those go back to STRAN in the same way the inputs do, when
> I say go back, I mean StruCAD, SACS, and STRAN?
>
> A.   I think most of the output reports go back all the way to
> STRAN.
>
> (Trans. pp. 206-207).

Further, plaintiff's expert, Donald Gehring, admits that the order

of the output reports is determined by the program itself, a

further reason to find lack of protectability.  See Deposition of

Donald Gehring, P. 93.

EDI is claiming copyright protection of input and output

formats as part of a compilation.  In other words, the arrangement

of multiple cards in a specific sequential order is alleged to be

what is copyrightable and not the individual cards themselves.  Or

as defined by the copyright act, a compilation is

> "a work formed by the collection and assembling of
> preexisting materials or of data that are selected,
> coordinated, or arranged in such a way that the resulting
> work as a whole constitutes an original work of
> authorship."   17 U.S.C. 101

Here, given the fact that so many of the input and output formats

for plaintiff's program derive from works in the public domain, it

29

is impossible to determine a sequence for the possibly protected elements of the programs. Indeed, even the sequence which plaintiff wants to have protected was in the public domain for all intents and purposes as noted in Dr. Garland's testimony quoted above at pages 114-118 of the trial transcript. He admits to having made no changes in the arrangement and sequence of the input cards in the program from the inception of its appearance on the market as an offshoot of the original STRAN program. Further, the Court notes that the Copyright Office refused to register the cards in question as a compilation, believing that the order of the cards was dictated by the program itself and therefore represented a method of operation rather than a unique original work of authorship.

The Court therefore finds that the order and sequence of input formats for which protection is now sought is not protectable as it has been in the public domain without protection dating back to STRAN. As to output formats, Dr. Garland cannot state with specificity whether and, if so, what changes in the order and sequence he has made to the output reports to change the sequence from the original unprotected versions of the various programs.

Alternatively, the Court moves on to the comparison portion of the analysis called for by the Fifth Circuit. Again, referencing

defendant's Exhibits 5, 6, 7, 8, 67, 68 and 69 developed for comparison purposes, the Court notes differentiations between the order and sequence of plaintiff's program modules and that of defendant's.

For example, referencing defendant's Exhibit 67, it appears that plaintiff's SACS III program took 21 of its 26 input formats from the formats of the unprotected SACS II program. Sixteen of those also came from STRAN. StruCAD*3D on the other hand has 160 total input formats. Fifteen are STRAN originated and six are SACS originated with regard to that portion which parallels SACS III. Further, the placement of formats in StruCAD*3D is different from that in SACS III. So the order and sequence of the usage in SACS III and StruCAD*3D cannot be held to be the same.

The same may be said for SEASTATE. Referencing defendant's Exhibit 68, the original unprotected SEASTATE program had seventeen input formats. The SEASTATE program at issue has forty input formats, seventeen of which came from the unprotected parent SEASTATE product. Only fifteen of those coming from the original unprotected SEASTATE are incorporated in StruCAD*3D and then in a completely different order and sequence from plaintiff's product.

An analysis and comparison of all input and output formats from all of the modules in plaintiff's SACS III, SACS IV, SEASTATE

31

and JOINTCAN programs with defendant's StruCAD*3D fail to establish commonality of sequence and order sufficient to establish that defendant has breached copyright law.

There will be judgment accordingly.

New Orleans, Louisiana, this ___30___ day of _April_, 2001.


_____
ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE

32